Kristie A. ALVEY, Plaintiff,

v.

**RAYOVAC CORPORATION,** Defendant.

No. 95–C–81–C.

United States District Court,
Western District of Wisconsin.

April 4, 1996.

Charles Barnhill, Davis, Miner, Barnhill & Galland, Madison, WI, for Plaintiff.

Julie Genovese, Foley & Lardner, Madison, WI, for Rayovac Corporation.

Thomas R. Crone, Melli, Walker, Pease & Ruhly, S.C., Madison, WI, for Ken Biller.

## OPINION AND ORDER

CRABB, District Judge.

This civil action for money damages is before the court following a trial in which a jury found that defendant Rayovac Corporation violated plaintiff Kristie Alvey's rights under Title VII, 42 U.S.C. § 2000e, in three respects: subjecting her to a hostile work environment that constituted sexual harassment, retaliating against her after she filed a complaint of sexual harassment and constructively discharging her. Defendant has moved for judgment as a matter of law or in the alternative for a new trial, contending that the jury lacked sufficient evidence to find for plaintiff on any of her claims. I will grant defendant's motion for judgment as a matter of law on plaintiff's sexual harassment and constructive discharge claims and will deny the motions for judgment as a matter of law and for a new trial with respect to plaintiff's claim of retaliation. Plaintiff failed to establish at trial that she was subjected to a hostile work environment that constituted sexual harassment. With respect to the claim of retaliation, I believe that a reasonable jury could have found from the evidence that defendant had retaliated against plaintiff for filing a sexual discrimination complaint. However, I am convinced that no reasonable jury could have found that the retaliation produced working conditions that would have caused a reasonable person to resign.

From the evidence adduced at trial, the jury could reasonably have found the following facts.

## FACTS

Plaintiff Kristie Alvey worked for defendant Rayovac Corporation at its world headquarters in Madison, Wisconsin, from December 1989 until August 1994, when she resigned. Defendant is a manufacturer and seller of batteries. Plaintiff began as a cost accountant and was promoted to the position of Business–Analyst in the Industrial Division in August 1991. In that position her supervisor was Patrick Mullen, who was Division Controller for United States Sales,

with financial responsibility for defendant's operations in the United States.

### A. Facts Relevant to Hostile Environment Claims

#### 1. Pre–April 1992 events

At defendant's December 1989 Christmas party, while music by the Beach Boys was playing, some of defendant's male employees stood on their wives' back and pretended to "surf" while their wives lay face down on the floor. Plaintiff observed this activity, thought it was strange and felt uncomfortable about it. At the same party, Patrick Mullen told the vice president who was plaintiff's supervisor at the time that the vice president had finally hired someone smaller than he was (referring to plaintiff) and added, "but of course you've got certain things or certain parts that are smaller." Plaintiff understood the allusion to be to her supervisor's sexual parts and the comment made her feel uncomfortable.

In May 1991 at a financial conference at Indian Lakes resort, defendant's general counsel told plaintiff as she joined him and several others at the dinner table that he had been listening for her footsteps because he could always tell a woman's breast size by the sound of her footsteps. Plaintiff was embarrassed and went to the women's room later. When she came back to the table, the conversation returned to general counsel's remark. At the same dinner, a giant brassière was awarded as a golf prize.

In September 1991, plaintiff was with regional sales manager Michael Alexander at the Boston airport. Alexander showed plaintiff a lingerie bow that he kept in his wallet and told her it belonged to another employee and that his wife understood the relationship. Earlier, Alexander had hugged and kissed the female district manager who had driven him and plaintiff to the airport and had said to plaintiff, "I always give my girls a hug and kiss. But don't worry, I won't do it to you today." On the way through the airport, Alexander tried putting his arm around plaintiff's shoulder but she moved away. During that same month, national sales manager Steve Tuscic described his back pain as an orgasm in the presence of plaintiff and

Patrick Mullen. When Mullen told him he didn't think plaintiff appreciated the comment, Tuscic replied, "That's OK. She's one of the boys now." Afterward, plaintiff told Mullen that Tuscic's remark made her uncomfortable. He replied that there was nothing he could do because Tuscic was a "street fighter" and you "wouldn't want to cross him."

Sometime in the fall of 1991, plaintiff walked into Steve Tuscic's office and saw that he was resting his hand on his secretary's leg. At two different company dinners, plaintiff saw Tuscic and his secretary eating off each other's plates. She complained about Tuscic's behavior to Greg Brady, vice president of sales, who first offered her a change of positions so that she would not have to work with Tuscic. When plaintiff rejected this offer, Brady arranged a meeting between plaintiff and Tuscic. Plaintiff told Tuscic that although she didn't care what he did in his private life, his behavior at work was affecting her ability to do her job and that she would prefer that she and Tuscic have a more professional relationship. After this meeting, Tuscic's behavior was more professional, although plaintiff did observe him on another occasion sharing food with his secretary at a company dinner.

At a company Christmas party in 1991, plaintiff observed a group of vice presidents taking turns dancing with a woman employee and slapping each other on the back as they finished. When plaintiff told one of the vice presidents that he should watch what he was doing, he told her that the woman employee wasn't smart enough to get them into trouble. At another Christmas party held that same year, held for the financial group, the vice president of finance and operations stood up to thank plaintiff and her husband for hosting the party and called out to one of the female employees at the back of the room that she should volunteer to host the next year's party. When she replied that she would do it only for a raise, he said, "I'll give you a raise, Donna, a really BIG raise."

In late 1991 or early 1992, Steve Tuscic left voice mail messages for his sales staff. The messages concerned a trip that would be awarded to the highest performing salespeo-

ple and included a reference to seeing "babes" on the beaches and a wolf whistle.

In February 1992, plaintiff attended a company sales meeting in Phoenix where she took part one evening in a co-ed game of "chicken" in the swimming pool with employees from the consumer division. While she was sitting on the shoulders of a male regional sales manager, trying to push other couples into the water, the sales manager put his hands up into her shorts, told her she had a nice body and tried to kiss her. The sales manager did not work in plaintiff's division, his office was in Minnesota and he had no supervisory relationship with plaintiff. At the same meeting, a salesman from Florida told plaintiff that she was good looking and asked her what he had to do to get "good pricing" from her. During the same month, plaintiff received and read a copy of defendant's sexual harassment policy, which provided that incidents of harassment by supervisors or upper level management were to be reported either to the Human Resources department or to Corporate Employee Relations. Plaintiff did not report the swimming pool incident or the pricing remark to anyone at the company.

In March 1992, plaintiff and her husband attended a St. Patrick's Day party at Mullen's home with other employees and some of Mullen's neighbors. The guests were expected to recite limericks, most of which had sexual implications. On the Monday morning following the party, Mullen and another employee asked one of the women who had been present to recite her limerick but she declined. There was no other reference to the limericks.

2. *Post April 1992 events*

At a company party in the summer of 1992, plaintiff attended a luau at which a photographer was taking pictures. Plaintiff agreed to be in a picture with vice president Greg Brady, whom she considered a good friend. Just as the picture was being taken, Brady leaned over and kissed her on the cheek. Plaintiff was embarrassed but she did not consider the kiss a sexual advance.

At the company's 1992 Christmas party, Greg Brady said to plaintiff while they were dancing that "there sure were a lot of horny women there that night." Plaintiff replied that there were probably a lot of horny men as well. At the same party, plaintiff observed Mullen dancing closely with a female employee.

In February 1993, plaintiff attended a sales conference in La Quinta, California. On one evening during the meeting, she experienced an unwelcome sexual advance by Ken Biller, a company vice president. Plaintiff reported the incident the next morning to Human Resources, which investigated the matter promptly. Biller was found to have engaged in misconduct and was disciplined. Although plaintiff had no further contact with Biller at any time, she was dissatisfied with the discipline meted out and filed a charge of sex discrimination with the state Equal Rights Division on February 23, 1993.

In March 1993, plaintiff was present during a meeting with Mullen, Tuscic and Greg Brady. There were some complaints about certain financial numbers under discussion and Tuscic asked, "What do you want me to do, take my magic genie wand and make these numbers go away?" to which Mullen replied, "Oh, please, not here. Don't take the genie wand out here."

In July 1993, plaintiff attended a company party in Madison at the Maple Bluff Country Club and heard a routine in which a comedian told dirty jokes and involved a female employee in the presentation of one of these jokes, requiring her to make vulgar gestures. The comedian had been hired by the secretary to defendant's national sales manager on the recommendation of the manager of the country club. No one at the company had any idea that the comedian's routine would include sexually suggestive jokes until he gave his first show. When the party organizer heard the first show, she sent the comedian on his way without letting him give a planned second show.

At a sales meeting in Galena, Illinois in September 1993, plaintiff and a number of other company employees took a pontoon cruise on the lake. The passengers began a water balloon fight and some pushed others into the water. At one point, someone

pushed Pam Statz, a supervisor of inside sales, into the water. When she came out, it appeared she had nothing on under her shorts. Gary Dial, a company manager, was driving one of the boats and he circled around Statz, saying he wanted to get a better look. Later that evening, during dinner and within the hearing range of a number of employees, including Mullen and plaintiff, Dial asked Statz "what kind of butt floss" she wore. Statz told Dial with some asperity that his remark was out of line. Statz never reported the remark to Human Resources.

At the same meeting in Galena, plaintiff returned to the town house in which she was staying after dinner and observed Mullen and Statz sitting hip-to-hip on a couch having a drink.

In September 1993, a male manager engaged one of plaintiff's female subordinates in conversation, ending with the remark, "It's been nice looking at you." When plaintiff heard about this remark, she reported it to Mullen, who asked the manager about it and admonished him.

In the fall of 1993, plaintiff attended a sales meeting in Beaver Creek, Colorado. On the way to Beaver Creek from the airport, plaintiff rode with about 15 to 20 people in an airport van. Mullen and another employee, Rod Ripley, spent part of the trip telling dirty jokes that could be overheard by others in the van, including plaintiff. As they neared their destination, Ripley told Mullen in a voice loud enough for plaintiff to hear that they really should watch it because someone might say it was sexual harassment. Mullen laughed.

At the Beaver Creek meeting, plaintiff went to a bar with some other employees one evening. While there, she saw some of the company executives, including Mullen, Marv Sieger (defendant's chief financial officer) and Glynn Rossa (defendant's treasurer) playing the game of "suck and blow" with some female employees. The game requires one person to suck a playing card up to his mouth and then blow it onto the mouth of the next player. No one asked plaintiff to play the game or made any comment suggesting she should.

Earlier in the evening, during dinner, a band had been playing. At some point, a senior vice president stood up and sang the Mac Davis song, "It's Hard to be Humble." When he came to the line that refers to filling out his tight blue jeans, he put his hands on his hips. The audience clapped and cheered and had him repeat the verse.

Linda Pauls, assistant treasurer and second highest ranking woman in the company, planned and presented a mock awards ceremony for the last evening of the week of meetings in Beaver Creek. She intended the event to provide light entertainment after a hard work week. Part of the program featured a roast of Marv Sieger, the chief financial officer, who received five awards, including a clock, in recognition of his often expressed view that any job that took more than five minutes was too long, a plastic bat and ball to note his love of sports, sardines and crackers to represent his favorite snack, a key to the city of Las Vegas because he loved to gamble and playing cards for the game of "suck and blow." Awards to other employees included silly hats for certain employees who were joggers, colorful socks for one man who liked such things, a Mickey Mouse tie to a man who favored bright ties and a T-shirt to an employee whose maiden name was Gander and who was known to many by the nickname of Goose. The front of the shirt said "Me Goose"; the back said "Goose Me." Pauls singled out this employee in a special effort to cheer her up because of the difficulties she was enduring at the time when her husband was ill with cancer. Another employee from England was given a pair of "vasectomy scissors" because his wife had just had another child. During the ceremony, there were several off-color remarks by a male employee: one about "shriveling" that could have been understood to refer to one award recipient's penis and another about the number of times the same man had had sex. Plaintiff was not given an award, was not asked to participate in the ceremony and was not mentioned directly or indirectly by anyone who did participate.

At some time in 1993, Glynn Rossa walked past plaintiff, slid a pencil down her back and said, "Why didn't you stop in when you

walked past my house last night?" Plaintiff did not consider this a sexual advance but it made her uncomfortable.

In the spring of 1994, defendant held HIV–AIDS training for its employees. When the trainer told the group that the best way to avoid contracting AIDS was to practice abstinence, general counsel said, "We all know that's not going to happen. What's next?" When the trainer said, "You can use condoms," he said, "Next."

With the exception of the Biller incident, plaintiff never complained to anyone in Human Resources of having observed or heard any incident or remark that she found demeaning, humiliating or embarrassing. On a number of occasions, plaintiff talked to Steve Drake of the Human Relations department about her observations of Mullen and what she characterized as his sometimes vulgar ways and sexual innuendos. She never asked Drake to take any action. With the exception of her report to Greg Brady of Tuscic's relationship with his secretary, her complaint to Mullen about Tuscic's "orgasm" comment and her report to Mullen of the remark to her subordinate, plaintiff never told anyone in a higher position that any employee had said or done anything to her that she considered to be demeaning, humiliating or embarrassing or that she had observed or overheard any such conduct or remarks directed to others.

B. *Evidence Relating to Retaliation*

In the position of business analyst for the industrial division, plaintiff had a variety of duties, including daily pricing, supervision of three subordinates and special projects. The pricing was her primary task and required her to respond to requests for pricing information from the industrial account sales representatives. It was her responsibility to provide prices that were both competitive and consistent with prices quoted to other prospective buyers. In determining the prices, she had to take into consideration the company's goals and its need to make a profit.

During 1991 and 1992, plaintiff obtained the information she needed for making pricing decisions from her participation in discussions at managers meetings, in individual meetings with Mullen, in fiscal planning meetings with Mullen and Vice President of Finance Brady and in contract renewal discussions with Mullen and National Sales Manager Tuscic. During fiscal planning meetings, for example, plaintiff would review with Mullen the company's largest contracts, the profit margins on those accounts and the importance of particular customers.

During 1991 and 1992, in addition to her pricing work, plaintiff did financial analyses for large customers, for specific contracts and for promotion programs. The requests to do these analyses came from Mullen, although they may have originated from others, such as Tuscic. Plaintiff often did mini-profit and loss statements that were not requested by Mullen but were triggered by problems that arose when she was working out price quotations.

In the fall of 1992, plaintiff became responsible for doing sales deduction work, which required her to review problems with unpaid customer invoices that contained unexplained deductions. She was assigned a sales deduction specialist to assist her with this new task and her job was upgraded.

From August 1991 until June 1993, plaintiff went on approximately six customer visits and attended a number of regional and national meetings and conferences. At Mullen's suggestion, she attended seminars in effective supervision, handling difficult people, meeting deadlines and grammar.

During 1991 and 1992, plaintiff's working relationship with Mullen was open and friendly. When plaintiff disagreed with Mullen, she told him and he listened to her ideas. On special projects, the two would talk through the course of action at the outset and Mullen would follow up with her on the progress of the project. During the first six months that plaintiff worked for Mullen, she spent about two hours a day with him, reviewing price quotes. After the first six months and until the end of 1992, the time they spent together declined to about one-half hour to an hour a day and was spent discussing pricing, supervising and special projects. When plaintiff needed information from Mullen she was able to get it.

Plaintiff's work with the sales staff engendered many complaints and conflicts. Sales representatives were often dissatisfied with the pricing plaintiff gave them or with the time it took to receive a price. Some of them complained that certain customers or certain sales representatives received preferential pricing from plaintiff. In addition, they had problems with the procedure the division used to charge back unexplained deductions to the sales representatives. Before May 1993, Mullen told plaintiff repeatedly to disregard the complaints, saying they went with the job.

Sometime in May 1993, Mullen's attitude toward plaintiff became cooler. In that month, he and plaintiff drove together to a regional managers meeting in Galena, Illinois. Plaintiff found him businesslike and less friendly than he had been on a previous trip. In addition, he failed to ask about her father, although he knew that her father had had heart bypass surgery the week before.

In the course of the Galena meeting, a number of managers asked to meet with Mullen outside plaintiff's presence to discuss their complaints about the way she performed her job. Plaintiff and other employees who were not managers were asked to leave the meeting and were not told what the discussion would be. On the following Monday, Mullen told plaintiff that the managers had raised serious complaints about the problems she had in working with others, her tendency to hold grudges and her lack of timeliness in getting price quotes back to the field. Although plaintiff had known in the past that the staff had such complaints, she had never thought that Mullen viewed the complaints as seriously as he seemed to in May. Plaintiff viewed Mullen's demeanor and remarks as preparatory to putting her on probation or firing her. She told Mullen she was quitting and that he could "take the job and shove it." Then she called her husband and said that she was going home. Before she could leave, Mullen came to her office and tried to persuade her not to quit by suggesting she not make any rash decisions.

Plaintiff went home, talked to her husband, decided she could not afford to quit and went back to work. Later in the afternoon, Mullen came back to her office and told her he was glad she had come back.

In the morning meeting with Mullen, plaintiff had told him that she believed he was not as accessible to her as he had been and that her inability to meet with him regularly was impeding her ability to perform her job. Mullen told her he would try to be more available and for a time he was. However, on many occasions, instead of sitting down with plaintiff, he would tell her just to leave pricing questions on his desk for review and would return them to her with written comments.

In June 1993, Tuscic and Mullen met with the chief financial officer, the vice presidents of human resources and administration and the human resources department's training director to discuss plaintiff's career. They noted the complaints that had been made about her at the Galena meeting and they considered rotating her into another financial job, as was done customarily with employees at plaintiff's level after they had been in their jobs for two years. Because no comparable jobs were available at the time, nothing was done with this idea.

Until June 1993, plaintiff continued to do analyses, including one on defendant's new mercury-free battery. She worked on the division's fiscal plan for 1994.

After June 1993, neither Mullen nor Tuscic included plaintiff in discussions concerning which contracts would be filled with the old mercury batteries. She did not always know the reason for certain decisions. Mullen changed prices on some contracts without explaining to plaintiff what he was doing as he had done in the past.

After June 1993, Mullen did not ask plaintiff to do any quarterly promotional analyses, although he did not ask anyone else to do them. Plaintiff did one analysis in the fall of 1993 for the office products manager after she sought him out to ask whether he had any work she could do. In late 1993, the industrial division changed the promotional system it had used with its distributors. It set up a number of levels at which customers could participate in the promotions. Plaintiff

was involved in the planning for this tiered promotional program and had the principal role of making sure it was executed properly. Plaintiff's department retained responsibility for this program from its inception through the entire time that plaintiff worked for the company.

Plaintiff received a bonus for her work in August 1993, accompanied by a letter of commendation from the owner of the company.

Mullen was supposed to provide plaintiff with her annual evaluation in August 1993 but he did not give it to her until February 1994. In the evaluation, Mullen rated plaintiff's work as commendable, just as he had in her 1992 evaluation. In May 1993, he had recommended a four percent raise for plaintiff. Later, he increased the amount to five percent on the recommendation of the head of Human Resources. The delay in giving plaintiff her evaluation did not delay the effective date of the raise.

In the fall of 1993 or early part of 1994, Mullen talked to plaintiff about working on a project to consolidate price plans in the office products division to make them more consistent and less confusing to customers. Mullen listed this project as a goal in the performance review he gave plaintiff in February 1994, under "Objectives." He expected the project would take several months to complete. Plaintiff did no work on this project.

In September 1993, plaintiff told Mullen she did not have enough work and that his letting plaintiff's subordinates go around her to get pricing directly from him was making it difficult for her to do her job. She asked him to spend a little bit of time with her every day and he replied that if he spent ten minutes with her and ten minutes with each of the people he supervised, he would have blown an entire hour.

In a meeting held in the fall of 1993, Mullen told plaintiff sharply to "shut up" when she interjected remarks while he was asking the customer accounting manager certain questions. Plaintiff stayed in the meeting for a few minutes and then left because she was afraid she would begin to cry. Mullen talked to her later that day about leaving the meeting, calling it unprofessional. Plaintiff became angry that he was not apologizing to her for telling her to shut up and told him that she didn't want to discuss the matter further. In a meeting with Mullen and others in October 1993, plaintiff raised a problem she was having with the customer accounting department. Mullen's response was to tell her to handle it on her own.

At the end of December 1993, plaintiff filed a retaliation complaint with the Equal Rights Division, contending that she was being treated differently by her supervisor and other management personnel and that she was not getting the work assignments she had received in the past. Mullen's relationship with plaintiff became strained after she filed her complaint.

In the early part of 1994, plaintiff was busy for a few weeks doing a new promotions program. After that she filled her time with sales deduction work because her sales deduction specialist had left and the company had hiring freezes in effect that prevented plaintiff from hiring a replacement. Plaintiff told Mullen she was doing deductions because she didn't have any other work to do. He told her to hire a temporary employee but she thought that if she did she would be left with no work to do. On a number of occasions she told Mullen she did not have enough to do but he did not assign her any special projects.

In the spring of 1994, plaintiff interviewed a prospective employee but her part in the hiring decision was limited to advising Human Resources whether the employee would be acceptable to her. The actual hiring decision was made by Human Resources, as part of an effort to find positions for employees who had lost jobs in other divisions.

In the spring of 1994, plaintiff did no work on the 1995 fiscal plan. For that year, the company changed the preparation method. Instead of having each division prepare estimates of its volume, margins, special programs and expenses, defendant's executive staff dictated to each division what numbers it should use. Nothing in this process required any work by a business analyst.

Before January 1994, plaintiff's practice had been to review the 200 or so contracts

that were up for renewal to determine whether the prices quoted could remain in effect or would be increased. Once she signed off on the pricing, the contract would be sent to the sales representative. Each month she would consult with Mullen about three or four of the contracts if the pricing was lower than he had authorized her to approve or if the contract was particularly large or important. Beginning in January 1994, Mullen asked to review all of the recommended pricing. Often he would change the prices plaintiff had approved without discussing the changes with her and give the recommended pricing directly to the sales support staff, leaving her without the information she needed to do daily pricing. Many times, plaintiff did not understand Mullen's reasons for making a pricing change.

During the first six months of 1994, plaintiff spent her mornings doing daily pricing and the rest of the time doing deductions work and sometimes training new employees. She did not have enough to do so she offered help to the people she supervised and to Pat Cibik, Scott Yochum and Becky Jackson. Her lack of work made her feel humiliated. During this period, Mullen made frequent visits to other employees on the same floor on which plaintiff worked but stopped only rarely to see plaintiff. With other employees, Mullen had a friendly, joking manner. With plaintiff, he was curt and seemed tense.

In the middle of the summer of 1994, plaintiff went on medical leave for approximately two weeks. When she returned she received a memorandum from Mullen, responding to a July 29 memo she had sent him, expressing her concerns about his treatment of her. Mullen responded to the points plaintiff had raised and told her he was frustrated with plaintiff's unwillingness to sit down and talk to him about the problems of her job. He ended by saying that he would no longer respond to her written correspondence about her working conditions.

Plaintiff cried after reading Mullen's memo and then called her husband, but continued to work the rest of the day although she felt hopeless about any future change in her job conditions. On Friday morning, she gave Mullen her resignation and shortly thereafter, filed a charge of constructive discharge with the Equal Rights Division that supplemented her previous charge of sex discrimination.

After June 1993, plaintiff did not go on any customer visits. Plaintiff believes she was not invited to some staff meetings but cannot identify any specific one from which she was excluded. She knows of no regional sales meetings in 1993 or in the first half of 1994 to which she was not invited, with the exception of one in Fort Lauderdale at which Mullen was the single representative from their division. In December 1993, plaintiff was invited to the national sales meeting for the industrial division held in Orlando, Florida, but she chose not to attend. Between December 1993 and July 1994, Mullen did not attend any industrial managers meetings. He attended a July managers meeting in Madison that was held at a time when plaintiff had asked for leave for vacation. Plaintiff was invited to the Industrial National Sales Meeting in Madison in August 1994 and attended the first day of the meeting before she decided to resign.

Plaintiff never told Mullen that she wanted to work only on financially related projects. She knows of no financial analysis work that was given to anyone else to do. On a number of occasions Mullen asked plaintiff to analyze various contracts. Plaintiff could have done these analyses on her own without a request from Mullen. Such analyzes provided information that was helpful to the sales staff. On July 27, 1994, Mullen and Tuscic gave plaintiff a special project list of eight items. At the bottom of the list was the comment that the list was not intended to be "all encompassing. If you see areas that need assistance, talk to Steve or myself and we will discuss needs and priorities." Plaintiff viewed some of the projects on the list as clerical in nature.

Throughout the time plaintiff worked for defendant, she did the evaluation and price monitoring of price plans and made recommendations with regard to existing or potential problem areas. No one ever told her not to do anything that was listed in her job description and no one limited her in performing any responsibility listed in her job

description. Mullen never assigned any of the duties of plaintiff's job to anyone else.

In addition to daily pricing work, plaintiff had the responsibility each month to review every expiring contract. She was responsible also for quarterly business reviews that involved looking at each contract and comparing it to both the fiscal plan and the prior year, breaking it down into different channels, trying to isolate any variances in costs and trying to highlight any cause and effect for lost contracts.

After plaintiff resigned, her position was filled by Tony Cords, who had held a similar position in the consumer division. During the approximately eleven months that Cords held the job, he attended three managers meetings and one national meeting and made presentations at two of the meetings. He often did analyses on particular accounts before committing to a new price quote. He was not instructed to do these but initiated them himself. He spent his time working on 1) matters in "sales hold," which involved clearing sales that showed prices that did not match the prices in the system; 2) deductions, including developing a new tracking system for deductions; 3) rebates, including responding to a specific request from a customer to make a personal visit to the customer to explain the rebate program; 4) accruals that were issued on a quarterly basis; 5) financial analyses, including profit and loss analyses on particular accounts, either on his own initiative or at the request of a sales representative; 6) promotional analyses, including working directly with the marketing manager; and 7) product analyses that he initiated on his own. Cords set up an industrial promotional tracking system, working with the management information systems department, and an errors and omissions tracking system to assist in following up on disputed amounts that were treated as deductions from the commissions earned by the sales representatives. When he needed information from Mullen or Tuscic, he either called them on the phone or left a voice mail message for them. Mullen left him written messages on many matters.

When Cords took over plaintiff's position, he found over $200,000 worth of deductions work going back to January 1993 that had not been cleared, accrual checks that had been written but not issued for the quarter ending June 1994, and accrual balances that had not been cleaned up. For the entire time he held the position, he worked at least 50 hours a week and at the outset, he worked 60.

## OPINION

### A. *Sexual Harassment*

#### 1. *Statute of limitations*

Shortly before trial, I denied defendant's motion for summary judgment after concluding that a jury could find reasonably from the facts proposed by plaintiff and unopposed by defendant that defendant had created a demeaning and hostile work environment for women. In reaching this conclusion, I noted that plaintiff's claim of a hostile environment lay on the borderline of actionability but, expansively construed, it could be characterized as one that involved numerous instances of conduct by top level management, the cumulative effect of which could lead a jury to find both that "the atmosphere at the company was so intimidating, ridiculing and insulting as to alter the conditions of plaintiff's employment and create an abusive working environment." Oct. 27, 1995 order at 26. In addition, I believed that plaintiff's allegations might be sufficient to hold defendant liable despite plaintiff's failure to report any of the harassing incidents. Many of the incidents described by plaintiff were alleged not only to involve upper management officials but also to have occurred at public events in the presence of other upper management employees. I reasoned the knowledge and involvement of top level management and this knowledge and involvement could show the company's negligence in failing to prevent the harassment from occurring.

Although defendant argued that plaintiff should not be permitted to introduce evidence of incidents occurring more than 240 days before she filed her discrimination charge on February 23, 1993, I ruled that plaintiff could rely on her theory of a continuing violation to bring in evidence of inci-

dents that occurred outside the applicable period for filing sex discrimination claims, which in plaintiff's case was 300 days before she filed with the state Equal Rights Division. 42 U.S.C. § 2000e–5(e). Defendant argues that it was wrong to use 300 days for the limitations period, rather than 240 days. The issue is essentially irrelevant because none of the incidents listed by plaintiff occurred more than 240 days but less than 300 days before she filed her claim with the state Equal Rights Division. Nonetheless, I am persuaded that 300 days is the correct limitations period.

■■■ A complainant has 300 days from the date of the allegedly discriminatory act in which to file a timely complaint with the Equal Employment Opportunity Commission. If the complainant lives in a "deferral state" such as Wisconsin, she must first give the appropriate state agency sixty days in which to consider the complaint, which means that as a general rule she would have to file a charge with the state agency within 240 days of the alleged act in order to meet the EEOC's 300–day deadline. *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). However, Wisconsin is one of many states that have entered into worksharing agreements with the EEOC under which both agencies treat a complaint filed with one agency as cross-filed with the other and the state agency waives its right to exclusive jurisdiction over the initial processing of a complaint. Therefore, in Wisconsin, a charge of discrimination actionable under federal law is timely if it is filed with the state Equal Rights Division within 300 days of the alleged discriminatory act. *See Wisconsin Employment Law,* §§ 14.181, 14.247 (1994). *See also EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 112, 108 S.Ct. 1666, 1669, 100 L.Ed.2d 96 (1988) (state agency terminates its proceedings within meaning of § 706 of Title VII when it waives its exclusive 60–day period for initial processing of discrimination charge, pursuant to worksharing agreement with EEOC); *Worthington v. Union Pacific RR,* 948 F.2d 477, 482 (8th Cir.1991) (waiver of exclusive 60–day period for initial processing in Nebraska's worksharing agreement with EEOC is self-executing; accordingly, complaint filed with

Nebraska agency 299 days after alleged discrimination is timely) (citing *Sofferin v. American Airlines, Inc.,* 923 F.2d 552, 556 (7th Cir.1991)).

At trial, plaintiff was allowed to adduce evidence of conduct that took place more than 300 days before she filed her charge on the theory that it was part of an ongoing practice or pattern of discrimination that continued into the limitations period. After the trial concluded, the court of appeals decided *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164 (7th Cir. 1996), in which the court took the occasion to resolve a "vexing question" of the actionability of allegedly sexually harassing conduct that occurs outside the statutory limitations period but is related in some way to conduct within that period. *Id.* at 1165. Starting with the principle that statutes of limitation are not to be interpreted in a grudging fashion because "[t]hey serve the important purpose of encouraging the prompt filing of claims and by doing so of enhancing the likelihood of accurate determinations and removing debilitating uncertainty about legal liabilities," *id.* at 1165, the court concluded that continuing violations claims are subject to standard principles of limitations law, including the doctrines of discovery, equitable estoppel and equitable tolling.

■■ In deciding when a victim of sexual harassment must sue, the discovery doctrine applies: a suit is timely if it is brought "as soon as the harassment becomes sufficiently palpable that a reasonable person would realize she had a substantial claim under Title VII." *Id.* at 1166. If the suit is brought upon discovery of the harassment, the plaintiff can allege as unlawful the entire course of cumulative conduct that has made her working conditions unbearable, *id.,* including acts that occurred outside the limitations period. However, this concept of cumulation requires a showing of a single course of conduct, rather than discrete incidents that involved different actors or that took place under different circumstances. *Id.* at 1166–67. Finally, as a limiting principle, a plaintiff who has been the victim of a long chain of events cannot introduce the whole chain if at any

point along the line she would have been aware of her injury but failed to file. *Id.* at 1166–67. In that situation, she can sue for any acts of harassment that occurred within the limitations period, but she cannot introduce the acts that occurred beyond it. *Id.*

■ In allowing plaintiff to introduce evidence of acts that occurred more than 300 days before February 23, 1993, when she filed her discrimination charge, I relied on plaintiff's theory that the acts were all part of a pattern of conduct by upper level employees and on my reading of cases in which courts had allowed plaintiffs to proceed on hostile environment claims that spanned many years without determining whether the old events should have been barred because the plaintiff knew of the right to sue after each isolated incident. *See, e.g., Hutchison v. Amateur Electronic Supply,* 42 F.3d 1037, 1041–42 (7th Cir.1994) (harassing incidents over several years); *Carr v. Allison Gas Turbine Div., General Motors,* 32 F.3d 1007, 1010 (7th Cir.1994) (frequent and unambiguously harassing incidents covering five year period). The *Galloway* opinion requires a reexamination of the state of plaintiff's knowledge in the three-year period preceding her filing of a charge during which she was subjected allegedly to humiliating and harassing incidents.

I conclude from *Galloway* that plaintiff cannot base her suit on conduct that occurred more than 300 days before she filed her charge because it should have been evident to her that she was the victim of actionable harassment no later than February 1992, when she was assaulted while playing chicken in the swimming pool at the resort in Phoenix. This was a clear-cut instance of sexual misconduct. It is not unreasonable to expect plaintiff to sue before the statute ran on that conduct, even if she might not have thought before then that the previous incidents she found objectionable constituted sexual harassment.

It is true that it is often difficult for those who experience harassment to realize that the behavior to which they are subjected is actionable. *Galloway,* 78 F.3d 1164, offers a fair compromise between competing interests. On the one hand, there is the fact that much gender-related conduct that is humiliating, intimidating or demeaning is not recognized as legally actionable until it has continued over time. On the other hand, there is the employer's entitlement to reasonably prompt notice and a fair opportunity to defend against the charges. By requiring that the plaintiff sue "as soon as the harassment becomes sufficiently palpable that a reasonable person would realize she had a substantial claim under Title VII," *id.* at 1166, the court of appeals acknowledges these competing concerns as well as the interest the employer and the complainant share in putting an end to illegal practices.

The "reasonable person" standard requires the judge to assume the familiar role of deciding what a hypothetically reasonable person would understand about certain behavior. Some courts have applied a "reasonable woman" standard, *see, e.g., Ellison v. Brady,* 924 F.2d 872 (9th Cir.1991); *Yates v. Avco Corp.,* 819 F.2d 630 (6th Cir.1987). However, the Court of Appeals for the Seventh Circuit has never adopted this standard. In this instance, it seems plain that a reasonable person who was subjected to the unwanted groping and accompanying comments that plaintiff suffered in February 1992 would have realized she had an actionable claim, particularly if she had received and read her company's sexual harassment policy in the same month.

Even if *Galloway* did not require exclusion of the various incidents that took place outside the statute of limitations, evidence of the swimming pool incident, the attempted "hug" at the airport and the "What do I have to do to get good pricing?" statement should have been excluded because these incidents did not fit within the pattern that plaintiff hypothesized as showing a single course of conduct extending beyond the limitations period. Plaintiff's complaint was based upon a number of incidents involving many different actors and settings. Such discrete incidents will not make up the single course of conduct that must be shown in order to bring in incidents beyond the statutory limitations period unless there is a "sufficient nexus" between the time-barred events and those occurring within the limitations period. *See*

**1328**

*Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir.1995) (acts committed prior to limitations period will not be considered part of one continuing violation unless there is "sufficient nexus" between them and those occurring later). Plaintiff tried to show that the incidents were related because they either originated with the company's highest executives or were openly fostered and condoned by them. She identified these high level executives as including her supervisor and other directors, the vice presidents and other officers. Plf.'s Mem. in Opp. to Dft.'s Motion for Judgment, dkt. # 202, at 6. The swimming pool incident did not involve one of these high level executives but a regional sales manager who had no supervisory relationship with plaintiff. No one in defendant's headquarters office would have known about the incident because plaintiff never reported it to anyone. The same is true with respect to the attempted hugs in the airport. Again, the person responsible was a regional sales manager who had no supervisory relationship with plaintiff and plaintiff never reported the incident to anyone in personnel or corporate employee relations. Plaintiff did mention the incident months later to Pat Mullen, but did not suggest to him that she considered it a sexual harassment issue. The "good pricing" statement was made to plaintiff by a salesman who was no higher in the corporate hierarchy than plaintiff. Again, no one at defendant's headquarters would have known about it because plaintiff never reported it.

I conclude that it was error to admit evidence of these incidents that predated the limitations period. They did not fit plaintiff's theory of a continuing course of conduct attributable to the company because they did not involve members of the upper management of the company or persons who supervised plaintiff directly. As I will explain later, however, I believe that plaintiff failed to produce sufficient evidence from which a reasonable jury could have found a pervasively hostile work environment for which defendant should be held liable even if these incidents were taken into account.

2. *Defendant's liability for unreported incidents of sexual harassment*

■ Employers are not liable for sexual harassment that takes the form of a hostile environment unless they knew or should have known of the harassment and failed to prevent it or take appropriate corrective action. Barbara Lindemann and David D. Kadue, *Sexual Harassment in Employment Law* at 191–92 (1992). Employers can be held liable for the acts of supervisory employees if the harasser is acting within the scope of his or her employment or within the apparent scope of employment or if the employer is negligent in failing to prevent or remedy the harassment. *Id.* at 226. In allowing this case to go to trial, I noted that it was possible that plaintiff would be able to show that the conduct to which she was subjected either involved the company's top level management directly or occurred at company functions in the presence of the company's top executives. Such participation or knowledge could be sufficient to give the company constructive notice of the conduct and to show that defendant was negligent in preventing sexual harassment. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 447 (7th Cir.1994). When defendant filed its motion for summary judgment, its strategy was to accept all of plaintiff's proposed facts as true for the purpose of the motion and to argue that as a matter of law, the alleged incidents did not add up to actionable sexual harassment. However, at trial, the evidence revealed that one of the allegedly harassing events occurring after April 29, 1992 could not be attributed to anyone at the company. Plaintiff included as an example of the allegedly sexually hostile environment the comedian hired by defendant to entertain at a company party. In fact, no one at the company had any idea that the comedian's routine would include sexually suggestive jokes until he had given his first show.

The post April 1992 incidents that can be attributed to company employees include the following: 1) a remark made at a company dinner in the presence of management representatives by a sales manager to a female sales supervisor about "what kind of butt floss" she used, in reference to an incident earlier in the afternoon when the employee had landed in the water with her clothes on but without any visible signs of underwear;

2) the actions of the same sales manager during the afternoon when he circled the boat from which the sales supervisor had fallen into the water to "get a better look"; 3) a remark by Pat Mullen to the national sales manager about the manager's "magic genie wand"; 4) a remark made to plaintiff by a vice president about the number of "horny women" at a company dance; 5) a comment by general counsel at an HIV educational presentation to the effect that neither abstinence nor condoms were the answer for him; 6) a remark made to one of plaintiff's subordinates (out of plaintiff's hearing) by a sales manager that it had "been nice looking at her"; 7) a round of dirty jokes told by plaintiff's supervisor, Pat Mullen, in the back of a van and overheard by plaintiff from the middle of the van, together with a loud comment by another male employee that they had better be careful or the joke telling might be construed to be sexual harassment; 8) plaintiff's observation at an after-hours party at a bar of the company's chief financial officer and treasurer participating in a game of "suck and blow"; 9) an occasion on which the company treasurer ran a pencil down plaintiff's back to get her attention and said, "You didn't say hello when you walked past the house the other night"; 10) an after dinner rendition of a song by a senior vice president that included a line about filling out his tight blue jeans; and 11) Greg Brady's kiss on the cheek at Lincolnshire.

The public nature of these incidents and the involvement of supervisory employees are sufficient to give defendant constructive knowledge and to find defendant negligent if, in fact, the incidents can be characterized as sexually harassing. I turn next to that question.

### 3. *Nature of incidents*

■ Courts have not had an easy time defining sexually hostile environments. The Supreme Court has said that a sexually hostile environment must involve conduct that is more than merely offensive but severe or pervasive enough to create an objectively hostile or abusive work environment, that is, one that a reasonable person would find hos-

tile or abusive. However, the harassing conduct need not be so severe as to cause psychological injury, so long as the victim perceives it to be abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Such conduct alters the terms and conditions of the complainant's employment, in violation of Title VII. *Id.*

■ The Court of Appeals for the Seventh Circuit has given additional guidance in drawing a line between legal and illegal conduct. On the illegal side are sexual assaults, other nonconsensual physical contact, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures and pornographic pictures. On the legal side are "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir.1995). The laws against sexual harassment are intended to prevent women (and men as well) from having to work in situations in which they are subjected to behavior that is intimidating and makes them fear for their personal safety, that demeans them or humiliates them because of their gender, that conveys the impression that they will not be treated fairly or that otherwise makes their time at work so miserable they cannot perform effectively. *See, e.g., Harris*, 510 U.S. at ——, 114 S.Ct. at 369 (plaintiff told on several occasions in front of other employees, "You're a woman, what do you know?" and called a "dumb ass woman"); *Hutchison*, 42 F.3d at 1042 (company president quizzed female employees regularly about their sexual relations, forced them to overhear his salacious comments in telephone conversations with his brother, attempted physical contact with them frequently, brushed against them as they worked and commented regularly on their physical appearance while looking them up and down); *Carr*, 32 F.3d at 1009 (co-workers defaced plaintiff's property, stole her tools and mutilated her work clothing in addition to referring to her as "whore" and "cunt" on a daily basis and exposing themselves to her upon occasion). The laws are not designed to purge the workplace of vulgarity, bad manners or boorishness not intended to demean or intimidate female employees, *id.* at 1010,

or to prevent consensual sexual relationships between employees. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1353 (7th Cir.1995).

 Actionable sexual harassment has two parts: severity and pervasiveness. The two factors have an inverse relationship: the more frequent or pervasive the conduct, the lower the required level of severity. *Ellison*, 924 F.2d at 878 n. 8. In evaluating particular conduct, it is helpful to consider whether the conduct is verbal or physical, how frequently it is repeated, how hostile it is, whether the harasser is a supervisor, whether others engaged in the harassment and whether it was directed at others. Lindemann & Kadue, *supra*, at 176–79 (citing EEOC Policy Guidance on Sexual Harassment, 8 *Fair Empl. Prac. Man.* (BNA) 405:6689 (Mar. 19, 1990)).

 The conduct plaintiff observed and remarks she heard (or overheard) after April 29, 1992 do not add up to an environment that a reasonable employee would find abusive and hostile. Only four of the incidents could even be said to have been made to her or directed at her: the vice president's remark about horny women, the pencil incident, the kiss on the cheek and the comment in the van about being careful about telling dirty jokes. The horny women remark was boorish but nothing more. The pencil episode and the kiss were inappropriate nonconsensual physical contact but neither one was physically intimidating and plaintiff did not view them as sexual in nature. The two men responsible never repeated the acts or engaged in any similar conduct and neither one ever made any comment to plaintiff that she considered objectionable. The van incident came the closest to crossing the line. A jury could reasonably have viewed this as directed to plaintiff by persons who knew she had filed a discrimination charge and who wanted to embarrass and demean her. The other incident of note is the offensive "butt floss" remark addressed to Pam Statz.

Plaintiff complained to Pat Mullen about the "it's been nice looking at you" remark made to her subordinate although she herself did not hear it. Pat Mullen's response was to speak with the offender and admonish him. The remark was never repeated.

The evidence of the after-hours party involving the "suck and blow" game has no relevance to plaintiff's workplace environment. Even top level executives are entitled to make fools of themselves after work and on their own time. No one could say that their doing so would have affected plaintiff's working environment. The same is true with respect to the intimate dancing and affectionate interactions between co-workers that plaintiff observed. Plaintiff introduced no evidence that any of this behavior was not consensual. It is possible that consensual behavior can create an offensive environment, *see, e.g., Drinkwater v. Union Carbide Corp.*, 904 F.2d 853 (3d Cir.1990) (atmosphere might be hostile if "sexual discourse displaced standard business procedure in a way that prevented plaintiff from working in an environment in which she could be evaluated on grounds other than her sexuality"; such displacement might be shown if employees flaunted romantic nature of relationship or if romantic relationships were prevalent at workplace), but plaintiff has not shown that any such behavior was evident at work within the limitations period. Prior to that time, she had objected to Tuscic's treatment of his secretary and Tuscic stopped the objectionable treatment after she met with him.

It is not reasonable for plaintiff to view general counsel's statement about abstinence and condoms as harassing behavior. It was not directed at any female employee in particular. This leaves the magic genie wand remark and the tight blue jeans song, neither of which can be said to be anything more than vulgar and only one of which was made in the workplace. To view these as sexual harassment would require equating any sort of sexual innuendo to sexual harassment, regardless where it is expressed and under what circumstances. That is not the law. It is not reasonable to view these two incidents and the "awards ceremony" as anything other than mildly vulgar, sexually tinged banter, occurring primarily at parties.

I conclude that it was error for the jury to find that plaintiff was exposed to a hostile and abusive working environment, in viola-

tion of Title VII. The majority of the incidents that occurred within the limitations period fall clearly on the legal side of the line the Court of Appeals for the Seventh Circuit would draw. The van jokes and the "butt floss" remark are offensive and rude but they are not so serious as to suggest a hostile work environment either by themselves or in conjunction with the other incidents.

If the pre-April 1992 incidents that involved higher level executives or would have been known to them are taken into account, they too fall on the legal side of the Seventh Circuit's line. These include the St. Patrick's Day party limericks and the single reference to them in the workplace, the "babes on the beach" remark, the giant brassière award, the orgasm-like back pain remark, and the really BIG raise comment. Even adding the breast size remark made to plaintiff at the dinner table to the incident of the joke telling in the van and the butt floss remark does not demonstrate the allegedly "pervasive atmosphere" of sexual innuendo and macho insensitivity of which plaintiff complained. The infrequency of the offensive comments is relevant to an assessment of their impact. "A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville,* 50 F.3d at 431.

I am persuaded as well that even if the time-barred swimming pool incident and attempted hug at the airport are included in the evaluation, plaintiff has fallen short of showing that her workplace was hostile. This is not to say that the swimming pool incident was not serious. It is to say that this incident did not affect plaintiff's workplace environment. In evaluating that environment, it is fair to consider company dinners and company-sponsored entertainment. Plaintiff's job required her to attend these dinners and a reasonable employee in her position would not have considered herself free to shun them or to walk out if she found the circumstances hostile. However, the situation is different with respect to the swimming pool incident. Plaintiff had no work-related reason to enter into the "chicken" game. The people playing were not the people in her division. The man who assaulted her did not supervise her, did not have any occasion to work with her and did not even have an office in Madison. Plaintiff never testified that the incident affected her working environment and she would have had no basis for saying so.

I conclude that plaintiff did not adduce sufficient evidence from which a reasonable jury could have found that defendant subjected her to a hostile environment. Accordingly, I will grant defendant's motion for judgment as a matter of law on this claim.

### B. *Retaliation*

■ To establish a case of retaliation under Title VII, plaintiff must show that she engaged in statutorily protected expression and that because of this, defendant subjected her to an adverse employment action. Defendant concedes that plaintiff's filing of a complaint of discrimination was protected expression but argues that the motion for judgment as a matter of law should be granted because plaintiff failed to prove she was subjected to any adverse employment action. Plaintiff never contended that she was ever disciplined, denied a raise, threatened with discharge or given a negative performance review. Her claim of an adverse employment action rests on 1) the change in her day-to-day relationship with her supervisor, Pat Mullen, after he became aware of her discrimination charge; 2) a meeting held at Galena to discuss her working relationship with the sales staff, from which she was excluded; 3) a seven month delay in her performance appraisal; 4) an increase in her clerical duties; 5) diminished opportunities to go on business trips; 6) a decline in special project assignments; 7) her exclusion from the interviewing process when a new deductions specialist was hired to work with her; and 8) her lack of "real" work in the summer of 1994.

■ It is not necessary for plaintiff to show that she was disciplined, fired, denied a raise, threatened with discharge or given a negative evaluation. Significantly reduced material responsibilities can constitute adverse employment action. *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456–57 (7th Cir.1994). *See also Dahm v. Flynn,* 60 F.3d 253, 257 (7th Cir.1994) (in context of First

Amendment claim, court held that dramatic downward shift in skill level required to perform job can rise to level of adverse employment action).

■ Plaintiff testified at trial that Mullen treated her differently after he became aware of her discrimination charge, that he became much less accessible to her and made it more difficult for her to obtain the information and guidance she needed to do her job. Other employees corroborated this testimony. Although plaintiff has no right to a friendly, accessible supervisor, she does have a right to be free from retaliatory treatment that interferes with her work. *Saxton v. AT & T*, 10 F.3d 526, 534 (7th Cir.1993). In light of the testimony by plaintiff and others that Mullen continued to spend time joking and chatting with some of the other people he supervised, the jury was entitled to believe that the change in Mullen's treatment of plaintiff was motivated by a desire to retaliate against her for filing a sex discrimination charge.

The jury's finding is supportable even though many of plaintiff's asserted instances of retaliation are without merit. For example, the Galena meeting was initiated by sales people and not by Mullen and it did not lead to any disciplinary action against plaintiff or to any change in her job duties. The delay in her receipt of her performance appraisal is not evidence of retaliation. Her counterpart in the consumer sales division received his appraisal six or seven months late, just as she did, and the delay did not affect either the amount or the timing of her annual raise. The increase in plaintiff's clerical duties is attributable to the loss of an assistant at the same time that a hiring freeze went into place. Plaintiff cannot tie this to anything that Mullen did or did not do, particularly when he offered to let her hire a temporary employee to take over the work if she preferred not to do it herself.

Plaintiff complained of not doing the annual fiscal planning work in the spring of 1994, but this was the result of a company-wide policy that changed the budgeting process for the year and had nothing to do with Mullen. Finally, plaintiff testified that she had been excluded from the hiring process

when a new deductions specialist was hired to work with her. The evidence showed that the company was trying to find a position for a longtime employee whose former position had been eliminated and plaintiff's only role in the process was to interview the employee and determine whether she would be suitable.

Despite the fact that much of plaintiff's evidence does not support her claim of retaliation, a reasonable jury could have found retaliation from Mullen's unwillingness to give plaintiff the information she needed when she needed it, his failure to include her in the informational meetings she had attended in the past, his failure to let her know why he was changing prices, his allowing others to get pricing directly from him instead of from plaintiff and his failure to assign her the kinds of challenging financial analyses she had prepared in the past. It is true that plaintiff's successor initiated many of his own financial analyses without waiting for Mullen or anyone else to request them. However, the jury could have found reasonably that plaintiff's working relationship with Mullen was such that he would assign the projects in accordance with his evaluation of the company's needs and that his failure to do so after she filed her discrimination and retaliation complaints was an illegal response to those charges. Accordingly, defendant's motion for judgment as a matter of law will be denied as to this claim.

Defendant argues in the alternative that it is entitled to a new trial because the improperly admitted evidence of Mullen's conduct and remarks would have affected the jury's determination of the credibility of his testimony, which was critical to the retaliation issues. Contrary to defendant's characterization of the evidence regarding Mullen, not all of it was admitted improperly. It was not erroneous to allow evidence of post April 1992 incidents when it was not possible to determine before trial that these incidents would not add up to a sexually hostile or abusive atmosphere. However, even if the evidence was admitted improperly, it does not follow that it swayed the jury on the issues relating to retaliation or on its determination of Mullen's credibility. The jury

had clear instructions about retaliation and what plaintiff had to prove to support a verdict against defendant. Even if the jury thought Mullen was a "bad person" because of the sexual harassment evidence, as defendant argues, this does not mean that the jury assumed Mullen retaliated against plaintiff or that it did not assess his credibility fairly.

In support of its request for a new trial, defendant cites *Jerlyn Yacht Sales v. Roman Yacht Brokerage*, 950 F.2d 60, 69 (1st Cir. 1991), a case that holds that a new trial is required on all claims when the instructions are "fatally deficient" with respect to one claim and the deficiencies may have infected the jury's decision on other claims. That is not this case. In *Jerlyn*, the court of appeals ordered a new trial on the plaintiff's claim of breach of fiduciary duties and vacated the judgment on the claim of fraudulent misrepresentation, leaving the second claim open for a retrial. The court noted that the "fatally deficient" jury instructions concerning plaintiff's duties as a fiduciary may have misled the jury in deciding the fraudulent misrepresentation claim because the lower court did not explain to the jury the fiduciary's duty to disclose all material facts to his principals. This omission may have misled the jury in its decision on the misrepresentation claim if it was not aware that fraud can be found where a fiduciary conceals facts he is required to reveal because of his duty as a fiduciary. *Id.* In this case, the jury instructions were adequate to advise the jurors of the questions they needed to answer in considering each of the three separate claims. Defendant has not asserted that the instructions on the harassment claim affected the jury's understanding of the retaliation claim.

Jurors are presumed to follow instructions. It would be wrong to assume that the jurors found liability on the retaliation claim simply because they found liability on the sexual harassment claim or to think that they reasoned improperly in deciding the retaliation claim. I am not persuaded that defendant has shown any need or justification for ordering a new trial on plaintiff's claim of retaliation. Accordingly, its alternative motion for a new trial will be denied.

### C. *Constructive Discharge*

To prove constructive discharge, a plaintiff must show that the employer made her working conditions sufficiently adverse to cause a reasonable person to resign. *See Carr*, 32 F.3d at 1011–12; *Saxton*, 10 F.3d at 536–37 (citing *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 426 (7th Cir.1989)). The jury found that plaintiff had made this showing but I cannot say that the finding was supported by the evidence, once the alleged acts of sexual harassment are eliminated from consideration, as they must be. Difficulty in obtaining information, not being assigned as many challenging projects and being treated in a less friendly and joking manner do not add up to an environment in which a reasonable person would believe she had no option but to resign. Plaintiff continued to receive raises, she was invited to three sales meetings during late 1993 and the first eight months of 1994 and she continued to perform analytic work in connection with providing pricing information to the industrial division sales force. Moreover, if she did not want to continue to work with Mullen she could have asked for a rotation to another department. The company had offered such a remedy to her before when she had complained about the difficulty of working with Tuscic.

Plaintiff was not faced with an "aggravated situation" beyond "ordinary discrimination"; accordingly, she had an obligation to seek legal redress while remaining on the job. *See Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D.Ill.1984) (quoted with approval in *Rodgers v. Western–Southern Life Ins.*, 12 F.3d 668, 677 (7th Cir.1993) (employee must seek legal redress while remaining in job unless confronted with "aggravated situation" beyond "ordinary discrimination")). I conclude that the jury did not have sufficient evidence from which to find that a reasonable person in plaintiff's circumstances would have found the conditions of her job so intolerable as to cause her to resign. Accordingly, I will grant defendant's motion for judgment as a matter of law on this claim.

### ORDER

IT IS ORDERED that the motion of defendant Rayovac Corporation for judgment

as a matter of law is GRANTED with respect to plaintiff Kristie Alvey's claims of sex discrimination and constructive discharge and DENIED with respect to plaintiff's claim of retaliation; defendant's motion in the alternative for a new trial is DENIED with respect to plaintiff's claim of retaliation.